## Appendix "A"

### Frederick FULTON "Et-Al"
### Double Homicide
### Minto, N.B.

1. On Saturday August 21, 2004, at approximately 19:30 hrs Tammy MOWAT called 911 and advised the RCMP that they were having a family gathering at her husband's grandfathers residence, Fred FULTON, when all of a sudden there was lots of loud noise coming from the outside. Fred MOWAT, FULTON's grandson, went out to see what was going on. Fred MOWAT confronted a neighbour, Greg DESPRES, who had been bothering his grandfather in the past month. DESPRES pulled a large knife on MOWAT and held it to MOWAT's chest. RCMP attended 358 Slope Road, Minto, Sunbury County, NB and spoke to the victim Fred MOWAT. MOWAT advised that he and DESPRES got in each other's face when DESPRES pulled out his knife and pointed it to his chest. MOWAT said the he was not scared of DESPRES and chased him from his grandfathers residence at 358 Slope Road. Shortly after MOWAT chased DESPRES away, DESPRES appeared back on the road yelling and screaming with a knife again. MOWAT went back outside and chased DESPRES away again until the police arrived. Tammy heard DESPRES threaten Fred MOWAT. MOWAT stated that DESPRES was mad because he thinks MOWAT's grandfather turned off DESPRES water and no one has water there as there is something wrong with the well. MOWAT stated that DESPRES threatened that, "he's going to get us all". MOWAT was concerned with DESPRES as he was causing problems with MOWAT's grandfather, Fred FULTON, who is very ill. MOWAT sais that DESPRES turns up the music loud all night and runs tools in the yard all hours of the day, etc. Greg DESPRES was arrested a short time later at his own residence at 354 Slope Road. At the time of his arrest had a large bayonette tucked in his belt. DEPRES was subsequently charged with Uttering Threats and Assault with a weapon. Both matters went to trial on March 16th, 2005 at which time DESPRES was found guilty. The matter was not over until April 25th, 2005 for sentencing. A Pre-Sentence Report was ordered by the trial Judge.

2. On April 21st, 2005, Probation Officer, Douglas PITTS prepared a Pre-Sentence Report on Greg DESPRES that stated amongst other things, "Mr. DESPRES and his lifestyle have been of some annoyance to his neighbors and he has had difficulty with them in the past. His current offence involves his neighbors." Mr. PITTS wrote in his conclusion, " This writer does have concerns about Gregory DESPRES' mental wellness. Having said this he did report he does not hear voices or hallucinations. This writer feels some of his behaviour is questionable. This writer would respectfully suggest that in addition to any sentence that may be imposed by the court for these offences, the court may wish to direct that Gregory Allan DESPRES receive some form of community supervision in the future. While on community supervision he would be directed to the Mental Health Clinic for an assessment as well as to follow any counselling directions. It is also felt that he be restricted in the types and natures of weapons he could possess at this time."

3. On April 23rd, 2005, at 8:45 P.M. Fred FULTON and his common law wife Veronica DECARIE, were both at their home at 358 Slope Road, Minto, N.B. They had just had a visit with a family friend, John EDGARS. When EDGARS left there was no concerns of any problems for or with Mr. FULTON and his wife, Veronica.

4. On the evening of April 23rd, 2005 Greg DESPRES was at his residence at 354 Slope Road at approximately 6:00 P.M. as his grandfather had taken him to the local bank then dropped him home at that time.

5. Sometime during the late evening of April 23rd, 2005 and the early morning hours of April 24th, 2005 Greg DESPRES approached the FULTON residence by the commonly used side door stairway. It appears that he cut (knife) the screen door and unlocked it by turning a hand made door lock holder made of wood. He then proceeded to the residence rear door, being the entrance to the kitchen room, kicked the locked door open, (foot print on the door surface & evidence the door was forced open) DESPRES then proceeded directly to the victim's bedroom where he attacked Veronica DECARIE stabbing her several times. DESPRES also attacked and stabbed Mr. FULTON several times. It appears as if Mr. FULTON ran to the bathroom where he attempted to get cover by pinning himself down between the bathtub and the door using his legs to prevent DESPRES from opening the door. At some point the assault resumed. Mr. FULTON attempted to escape from the residence but was caught on the porch by DESPRES. DESPRES hauled Mr. FULTON back inside the kitchen where he continued to attack Mr. FULTON and ultimately beheaded him. DESPRES placed Mr. FULTON's severed head inside a pillow case which was later found on the floor near FULTON's body. DESPRES, either before hauling Mr. FULTON's body back inside the kitchen from the porch or as he exited the premise cut the screen with his knife and pulled the outdoor light sensor switch rendering it inoperable. DESPRES searched DECARIE's purse that was in the kitchen at which time he took her car keys and possibly some money.

6. On Sunday, April 24th, 2005 between 09:00 hrs to 10:00 hrs Fred FULTON (Deceased) traditionally called his son Carl FULTON at this time but on this date he did not. At 12:00 hrs John EDGERS went into Minto around noon to get some milk at which time he noticed that Fulton's car was not in the driveway.

7. On Monday, April 25th, 2005 at 00:01 hrs John & Reita TAYLOR of 4 Boundary Street, St Stephen were driving south to St. Stephen around midnight on Hwy # 3 between the Lawrence Station Regional Landfill and Brockway when they observed a male standing on the side of the hwy in heavy rain folding what she described as a white sheet. This person was standing near a bridge that crosses Hwy # 3 near a water flowage area.

8. On April 25th, 2005 at 03:30 hrs to 03:34 hrs a guy fitting Despres description was picked up hitch hiking at Lawrence Station on Hwy #3 by Ernie DAYE and dropped off at

Andersonville Church at the intersection of Hwy # 3 & Rt. # 630. Despres carrying his chain saw and back pack.

9. On April 25th, 2005 at approximately 05:30 hrs Alvin Andrew MOFFITT was hauling wood from Nackawic to the mill in Woodland, Maine, along Hwy #3 when the trucker in front of him, Roger Morrow called him on the radio to tell him to watch out for the guy walking on the side of the highway. This would have been at "Goat Brook" which is approximately two kilometers south along Hwy #3 below the church where you turn off to go to McAdam ( intersection 630 where DAYE dropped off Despres ). When MOFFITT went past the guy he saw that he had on a pair of baggy white pants, black type jacket with a hood and he was carrying something that looked like a black ski-doo helmet.

10. On April 25th, 2005 between 06:30 hrs to 07:00 hrs Greg Harnish picked up a guy fitting Despres description around 6:30 hrs between Lawrence Station and Dewolfe along Hwy #3. Harnish said it was either Monday or Tuesday morning and it was raining heavily. Harnish stated that the guy was wearing a full face black motor cycle helmet when he picked him up. The guy took off the helmet when he got into the vehicle. He sat in the back seat even though the front seat was empty. The guy had a bag, brown or a dark beige, with a few tools sticking out of it. One looked like a machette, the other one was a flat hatchet and a green chain saw maybe a "pollen". Harnish asked him if he worked in the woods and he said he was meeting someone and they were going to work in the woods. When they got near town Harnish asked him where he wanted to be dropped off. The guy said he wanted to go somewhere near a phone where he could call the person he was suppose to be meeting up with. Harnish offered to take him to the mall but the guy said he rather not go there where there was a lot of people around. Harnish kept going into town to the next phone which is on the side of McNay's Restaurant on King street. Harnish showed him the phone and he said that would be fine and he dropped him off there. The guy had dark hair real short on the sides, longer in the middle like a mohawk and brown eyes. It was around 7:00 hrs when Harnish dropped him off.

11. On April 25th, 2005 between 08:00 hrs to 8:30 hrs Donald Philips was opening his store, Philip's Furniture Monday morning when he saw a male walking with a chain saw. He opened the back door to his store and saw the same male taking off a pair of pants and putting them in a shopping cart behind his business, Philip's Furniture In St. Stephen. The pants were still in the cart on April 27th so he placed them inside his store until they were seized by police on April 29th. Subsequent inspection of the pants found by Mr. PHILIPS showed that they contain traces of suspected blood.

12. On April 25th, 2005 between 08:30 hrs to 08:45 hrs Despres crosses from St. Stephen, N.B. into Calais, Maine where he is questioned by US authorities and has some of his belongings seized, including a chainsaw, samurai sword, dagger, brass knuckles, axe, knife, plastic tiedowns and a mouth guard. Despres was also wearing a military flak jacket and had told the Customs Officers that he was a Lieutenant in the US Marines. Despres, being a Canadian-born, naturalized U.S. citizen, was released into the US as he

hadn't committed any violations of law in the US.

13. On April 25th, 2005 between 08:30 hrs to 09:00 hrs Stacie LeFrance sees a male person in his early 20's walking down King Street in St. Stephen near the "East Coast Action Sports" store. He had a greenish coloured chain saw hanging off of a book bag he had on his back pack. He also had a strange hair cut.

14. On April 25th, 2005 at 10:00 hrs Greg Despres was scheduled to appear in Burton Provincial court to be sentenced on Aug. 21, 2004, charges of assaulting Frederick Mowat with a knife and threatening him. Despres did not show and a warrant was issued for his arrest for failure to appear.

15. On April 25th, 2005 at 10:30 hrs, Cst. Ross DAVIS, St. Stephen Detachment, received a call from the U.S. Immigration Main port by Officer Jake CHAMBERS to attend the office. Officer CHAMBERS stated that he had a male person there by the name of Gregory DESPRES and wanted Cst. DAVIS to query a serial # from a chainsaw that Gregory was carrying. Officer CHAMBERS showed Cst. DAVIS some other weapons that were carried by Greg, one a long home-made sword similar to a Ninja sword but ground from what appeared to be aluminum it has his last name engraved in it and a swastika symbol beside it and a wooden handle. There was a hatchet, a mouth guard (black), two brass knuckles, but appeared to be home-made from aluminum, a small black container of pepper spray, 1 white pull tie, 1 green purple chainsaw. Officer CHAMBERS pointed out to Cst. DAVIS what appeared to be blood spots on the chainsaw. Cst. DAVIS did see light red spatter on the saw. Officer CHAMBERS told Cst. DAVIS that Gregory said he had hiked from PEI and had been dropped off at Tim Horton's in St. Stephen, walked to Immigration through St. Stephen. Officer CHAMBERS said that Gregory stated he was a Sergeant in the Marine core that he had a helicopter waiting for him that he worked for the President. Officer CHAMBERS said he could not stop him from entering the U.S. after, he was cleared. Gregory walked out the door and down the road towards Calais.

16. On April 25th, 2005 at 13:15 hrs Alvin Andrew MOFFITT, who had past a guy carrying a black ski-doo type helmet earlier in the morning around 05:30 hrs, was on his second return trip from the mill in Woodland, Maine, when he saw the same guy he saw earlier in the morning in Milltown on the US side near the Canadian border. (MOFFITT had just left the scales about fifteen minutes earlier and had a time card to show the time.) MOFFITT noticed this time that the guy had a mohawk hair cut and the same cloths as before.

17. On April 25th, 2005 between 18:00 hrs to 20:00 hrs Despres seen at the Irving Big Stop in Baileyville, Maine.

18. On Tuesday, April 26th, 2005 at 15:01 hrs a 911 was placed by Paul LaBlanc after Debbie

Mowat discovered the remains of her father at 358 Slope Road. Paul Joseph LEBLANC, advised that his wife, Therese LEBLANC, heard a person screaming outside. Upon closer investigation Therese, saw that it was Debbie MOWAT, standing outside at the head of Fred FULTON's driveway. When Paul LEBLANC went outside, his wife was already talking to MOWAT. They asked MOWAT what happened. MOWAT advised that her dad was on the floor dead and that someone cut his head off. Paul LEBLANC used his portable telephone to call 911 and advised them of the information as he knew it. Paul LEBLANC advised that he last saw FULTON on Saturday, April 23rd, 2005 between 2 P.M. and 4 P.M. when was outside getting his newspaper. LEBLANC further advised that he last saw Greg DESPRES on Saturday, April 23rd, 2005 at about 12:00 P.M. when he drove past his trailer and noticed that the door was open. LEBLANC also saw him putting boards on the side of his shed. LEBLANC further advised police that he saw DESPRES a few weeks ago with a large knife tucked into the back of his pants. The knife he saw had a light brown leather sheath.

19. On April 26th, 2005 at 19:06 hrs Cpl. Don HULSMAN from RCMP Identification Section and Cst. Allan ROGERS of RCMP Major Crime Unit entered the residence at 358 Slope Road and found the remains of a male subject, who had been decapitated laying in the middle of the kitchen floor.

20. On Wednesday, April 27th, 2005 at 00:30 hrs (Atlantic Time) Greg Despres was arrested in Mattapoisett, Mass., at 23:30 hrs, local time "Eastern" time, on 2005-04-26, about 90 kilometres south of Boston. He was charged with being a fugitive from justice. At the time of his arrest DESPRES was in possession of clothing and boots that had on them traces of suspected blood.

21. On April 27th, 2005, Cpl. Dan PARLEE did an aerial search in a US Border Patrol Helicopter flown by Sgt. Gary BAER. That at 11:30 hrs they spotted red Ford Taurus in a gravel pit off of Route 3 near #5145, Brockway, New Brunswick. The vehicle was confirmed to be the victim's missing vehicle, GCU 831. That at 12:20 hrs, Cpl. PARLEE turned the vehicle over to Cpl. Paul OUELLETTE's possession.

22. On April 27th, 2005, at 09:54 hrs, Cst. Greg LUPSON took a witness statement from Bertha DESPRES, grandmother to Gregory DESPRES. Bertha states Gregory wears boots that lace up high in the front. That the boots were old, but he kept them clean, used brush and polish. It was abnormal for Gregory to take all of his clothes, that he usually changes to clean clothes, comes back dirty and changes. He would have taken dress shirt (court shirt) with him. Only has one other pair of footwear, old sneakers, normally wears his boots. Bertha indicated there was some clothes in his room (no door) but they're all clean now. There was a knife on the dresser and a sword on the wall. Doesn't know if he took that home on Saturday or not. Computer is in Adolph's room. Bertha does not know how to use it. Sneakers are not in residence now, never wore them much she states. She said that Gregory stated they'd never take him alive with respect to court, should they ever try to handcuff him.

23. On April 27th, 2005 at 11:26 hrs, Cst. Greg LUPSON took a witness statement from Adolph DESPRES, grandfather to Gregory DESPRES, where he stated that Gregory liked to talk to himself in the mirror for hours. Thought there was definitely something wrong with him but couldn't do anything about it. Heard that Gregory made his own weapons such as a sword made out of aluminum cause he had taken a piece of aluminum from him. Thought the sword was hanging up on the wall in the shed. That Gregory was wearing his black boots, the army boots and that he kept them shined up just like in the cadets. Also wearing black shiny pants, and a black sweat shirt with a hood on it and his knapsack.

24. RCMP Major Crime Unit and continue to investigate in co-operation with American Authorities.

APR-28-2005  17:05     JTAT- F. SUMMIT              5069604054   P.02

On Wednesday, April 27th, 2005 at 1:43pm (AST) Corporal Kevin Jackson and Constable Lise Robichaud, Peace Officers and members of the Royal Canadian Mounted Police viewed the following items at Calais, Maine, in the United States of America:

1. One chainsaw, green and purple in color with a black chain bar. Possibly a Poulan.

2. One homemade sword with a wooden handle. Blade appears to be constructed of aluminum.

3. One hatchet, rusted

4. One knife, silver blade with a wooden handle

5. Two homemade "brass knuckles" which appear to be constructed of aluminum

6. One black container which appears to be "pepper spray" or OC spray

The above items are under the control of exhibit custodian Timothy Lacasse, Assistant Area Port Director, United States Customs and Border Protection, United States Department of Homeland Security.

Corporal Kevin Jackson has viewed a copy of the Custody Receipt for Seized Property and Evidence compiled by United States Customs and Border Protection officer John Chambers and signed by Timothy Lacasse and can state the above described items accurately reflect property recorded as seized from Gregory Despres on the 25th day of April, 2005 at 3 Customs Street, Calais, Maine in the United States of America.

Dated this 28th day of April, 2005 at Oromocto, Sunbury County, New Brunswick.

Kevin Jackson, Corporal
District 2 Oromocto G.I.S.
(506)357-4300

## Assaults

Uttering threats
264.1 (1) Every one commits an offence who, in any manner, knowingly utters, conveys or causes any person to receive a threat

(a) to cause death or bodily harm to any person;

(b) to burn, destroy or damage real or personal property; or

(c) to kill, poison or injure an animal or bird that is the property of any person.

Punishment
(2) Every one who commits an offence under paragraph (1)(a) is guilty of

(a) an indictable offence and liable to imprisonment for a term not exceeding five years; or

(b) an offence punishable on summary conviction and liable to imprisonment for a term not exceeding eighteen months.

267. Every one who, in committing an assault,

(a) carries, uses or threatens to use a weapon or an imitation thereof, or

(b) causes bodily harm to the complainant,

is guilty of an indictable offence and liable to imprisonment for a term not exceeding ten years or an offence punishable on summary conviction and liable to imprisonment for a term not exceeding eighteen months.

R.S., 1985, c. C-46, s. 267; 1994, c. 44, s. 17.

large without excuse   **145.** (1) Every one who

(a) escapes from lawful custody, or

(b) is, before the expiration of a term of imprisonment to which he was sentenced, at large in or out of Canada without lawful excuse, the proof of which lies on him,

is guilty of an indictable offence and liable to imprisonment for a term not exceeding two years or is guilty of an offence punishable on summary conviction.

Failure to attend court   (2) Every one who,

(a) being at large on his undertaking or recognizance given to or entered into before a justice or judge, fails, without lawful excuse, the proof of which lies on him, to attend court in accordance with the undertaking or recognizance, or

(b) having appeared before a court, justice or judge, fails, without lawful excuse, the proof of which lies on him, to attend court as thereafter required by the court, justice or judge,

or to surrender himself in accordance with an order of the court, justice or judge, as the case may be, is guilty of an indictable offence and liable to imprisonment for a term not exceeding two years or is guilty of an offence punishable on summary conviction.

injury that results in death, he causes the death of that human being notwithstanding that the effect of the bodily injury is only to accelerate his death from a disease or disorder arising from some other cause.

R.S., c. C-34, s. 209.

227. [Repealed, 1999, c. 5, s. 9]

Killing by Influence on the mind

228. No person commits culpable homicide where he causes the death of a human being

(a) by any influence on the mind alone, or

(b) by any disorder or disease resulting from influence on the mind alone,

but this section does not apply where a person causes the death of a child or sick person by wilfully frightening him.

R.S., c. C-34, s. 211.

### Murder, Manslaughter and Infanticide

Murder

229. Culpable homicide is murder

(a) where the person who causes the death of a human being

  (i) means to cause his death, or

  (ii) means to cause him bodily harm that he knows is likely to cause his death, and is reckless whether death ensues or not;

(b) where a person, meaning to cause death to a human being or meaning to cause him bodily harm that he knows is likely to cause his death, and being reckless whether death ensues or not, by accident or mistake causes death to another human being, notwithstanding that he does not mean to cause death or bodily harm to that human being; or

(c) where a person, for an unlawful object, does anything that he knows or ought to know is likely to cause death, and thereby causes death to a human being, notwithstanding that he desires to effect his object without causing death or bodily harm to any human being.

R.S., c. C-34, s. 212.

Murder in commission of offences

230. Culpable homicide is murder where a person causes the death of a human being while committing or attempting to commit high treason or treason or an offence mentioned in section 52 (sabotage), 75 (piratical acts), 76 (hijacking an aircraft), 144 or subsection 145(1) or sections 146 to 148 (escape or rescue from prison or

lawful custody), section 270 (assaulting a peace officer), section 271 (sexual assault), 272 (sexual assault with a weapon, threats to a third party or causing bodily harm), 273 (aggravated sexual assault), 279 (kidnapping and forcible confinement), 279.1 (hostage taking), 343 (robbery), 348 (breaking and entering) or 433 or 434 (arson), whether or not the person means to cause death to any human being and whether or not he knows that death is likely to be caused to any human being, if

(a) he means to cause bodily harm for the purpose of

(i) facilitating the commission of the offence, or

(ii) facilitating his flight after committing or attempting to commit the offence,

and the death ensues from the bodily harm;

(b) he administers a stupefying or overpowering thing for a purpose mentioned in paragraph (a), and the death ensues therefrom; or

(c) he wilfully stops, by any means, the breath of a human being for a purpose mentioned in paragraph (a), and the death ensues therefrom.

(d) [Repealed, 1991, c. 4, s. 1]

R.S., 1985, c. C-46, s. 230; R.S., 1985, c. 27 (1st Supp.), s. 40; 1991, c. 4, s. 1.

Classification of murder

231. (1) Murder is first degree murder or second degree murder.

Planned and deliberate murder

(2) Murder is first degree murder when it is planned and deliberate.

Contracted murder

(3) Without limiting the generality of subsection (2), murder is planned and deliberate when it is committed pursuant to an arrangement under which money or anything of value passes or is intended to pass from one person to another, or is promised by one person to another, as consideration for that other's causing or assisting in causing the death of anyone or counselling another person to do any act causing or assisting in causing that death.

Murder of peace officer, etc.

(4) Irrespective of whether a murder is planned and deliberate on the part of any person, murder is first degree murder when the victim is

(a) a police officer, police constable, constable, sheriff, deputy sheriff, sheriff's officer or other person employed for the preservation and maintenance of the public peace, acting in the course of his duties;

(b) a warden, deputy warden, instructor, keeper, jailer, guard or other officer or a permanent employee of a

prison, acting in the course of his duties; or

(c) a person working in a prison with the permission of the prison authorities and acting in the course of his work therein.

**Hijacking, sexual assault or kidnapping**

(5) Irrespective of whether a murder is planned and deliberate on the part of any person, murder is first degree murder in respect of a person when the death is caused by that person while committing or attempting to commit an offence under one of the following sections:

(a) section 76 (hijacking an aircraft);

(b) section 271 (sexual assault);

(c) section 272 (sexual assault with a weapon, threats to a third party or causing bodily harm);

(d) section 273 (aggravated sexual assault);

(e) section 279 (kidnapping and forcible confinement); or

(f) section 279.1 (hostage taking).

**Criminal harassment**

(6) Irrespective of whether a murder is planned and deliberate on the part of any person, murder is first degree murder when the death is caused by that person while committing or attempting to commit an offence under section 264 and the person committing that offence intended to cause the person murdered to fear for the safety of the person murdered or the safety of anyone known to the person murdered.

**Murder during terrorist activity**

(6.01) Irrespective of whether a murder is planned and deliberate on the part of a person, murder is first degree murder when the death is caused while committing or attempting to commit an indictable offence under this or any other Act of Parliament where the act or omission constituting the offence also constitutes a terrorist activity.

**Using explosives in association with criminal organization**

(6.1) Irrespective of whether a murder is planned and deliberate on the part of a person, murder is first degree murder when the death is caused while committing or attempting to commit an offence under section 81 for the benefit of, at the direction of or in association with a criminal organization.

**Intimidation**

(6.2) Irrespective of whether a murder is planned and deliberate on the part of a person, murder is first degree murder when the death is caused while committing or attempting to commit an offence under section 423.1.

**Second degree murder**

(7) All murder that is not first degree murder is second degree murder.

R.S., 1985, c. C-46, s. 231; R.S., 1985, c. 27 (1st Supp.), ss. 7, 35, 40, 185(F), c. 1 (4th Supp.), s. 18(F); 1997, c. 16, s. 3, c. 23, s. 8; 2001, c. 32, s. 9, c. 41, s. 9.

Murder reduced to manslaughter

232. (1) Culpable homicide that otherwise would be murder may be reduced to manslaughter if the person who committed it did so in the heat of passion caused by sudden provocation.

What is provocation

(2) A wrongful act or an insult that is of such a nature as to be sufficient to deprive an ordinary person of the power of self-control is provocation for the purposes of this section if the accused acted on it on the sudden and before there was time for his passion to cool.

Questions of fact

(3) For the purposes of this section, the questions

(a) whether a particular wrongful act or insult amounted to provocation, and

(b) whether the accused was deprived of the power of self-control by the provocation that he alleges he received,

are questions of fact, but no one shall be deemed to have given provocation to another by doing anything that he had a legal right to do, or by doing anything that the accused incited him to do in order to provide the accused with an excuse for causing death or bodily harm to any human being.

Death during illegal arrest

(4) Culpable homicide that otherwise would be murder is not necessarily manslaughter by reason only that it was committed by a person who was being arrested illegally, but the fact that the illegality of the arrest was known to the accused may be evidence of provocation for the purpose of this section.

R.S., c. C-34, s. 215.

Infanticide

233. A female person commits infanticide when by a wilful act or omission she causes the death of her newly-born child, if at the time of the act or omission she is not fully recovered from the effects of giving birth to the child and by reason thereof or of the effect of lactation consequent on the birth of the child her mind is then disturbed.

R.S., c. C-34, s. 216.

Manslaughter

234. Culpable homicide that is not murder or infanticide is manslaughter.

R.S., c. C-34, s. 217.

Punishment for murder

235. (1) Every one who commits first degree murder or second degree murder is guilty of an indictable offence and shall be sentenced to imprisonment for life.

Minimum punishment

(2) For the purposes of Part XXIII, the sentence of imprisonment for life prescribed by this section is a minimum punishment.

R.S., c. C-34, s. 218; 1973-74, c. 38, s. 3; 1974-75-76, c.









